# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LETY RAMIREZ, on behalf of herself and
all others similarly situated

       Plaintiff,

Case No.: 07-CV-2173

v.

MIDWEST AIRLINES, INC., and DOES 1
through 10, inclusive

       Defendant.

## DEFENDANT MIDWEST AIRLINES, INC.'S MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

Lety Ramirez ("Plaintiff") seeks certification of a national class of individuals who received receipts from Midwest Airlines ("Midwest") in connection with in-flight purchases made aboard aircraft between December, 2006 and June 10, 2007. These receipts contained the purchaser's credit card[1] expiration date, purportedly in violation of 15 U.S.C. § 1681c(g). Plaintiff seeks certification of a class and demands statutory damages of $100 to $1,000 per claim, punitive damages and costs and attorneys' fees. Plaintiff acknowledges that she suffered no damages and has no evidence that any potential class member has. As discussed below,

---

[1] Herein, references to "credit card" should be read to include both credit and debit cards.

plaintiff's motion for certification should be denied for the same reasons a growing number of federal courts have denied class certification in § 1681c(g) cases.[2]

*Saunders v. Louise's Trattoria*, 2007 WL 4812287 at *1 (C.D. Cal. Oct. 23, 2007), compiled a number of recent, virtually identical FACTA decisions denying certification. The common, core bases for denial were:

> 1. Plaintiff is seeking damages which are grossly disproportionate to any harm suffered.[3]
>
> 2. Defendants voluntarily excluded expiration dates from receipts without any order or judgment requiring them to do so.
>
> 3. The enormity of potential statutory damages awards in the absence of any claim of actual damages raises the potential for attorney abuse of the class action procedure.
>
> 4. Congress provided significant incentives for individual claims, *i.e.*, the potential for significant individual judgments including statutory or actual damages, costs and fees, and punitive damages.

*Id.*

These factors led other courts to deny certification in indistinguishable FACTA cases. Like the cases cited by the *Saunders* court, the statutory damages sought here are grossly disproportionate especially since there has been no harm caused by the conduct alleged; Midwest acted promptly to ensure the exclusion of expiration dates from receipts, *See* Exhibit 1,

---

[2] This statutory provision was enacted as part of the Fair and Accurate Credit Transaction Act of 2003 ("FACTA") which amended the Fair Credit Reporting Act ("FCRA").

[3] The Court of Appeals for the Tenth Circuit has specifically recognized that it is appropriate for District Courts to deny certification of a class where aggregated statutory damages would be potentially enormous and unrelated to any actual damages or harm. *See Wilcox v. Commerce Bank*, 474 F.2d 336, 346 (10th Cir. 1973).

Declaration of Alex Yarmulnik, at ¶¶ 7-10, and Exhibit 2, Declaration of Dawn Polzean, at ¶¶ 2-3; the prospect of an enormous statutory damages award absent any actual damages creates the potential for attorney abuse; and Congress provided individual members of the proposed class economic statutory incentives to pursue their own claims, including awards of costs and attorneys' fees to prevailing parties.

An undisputed and unique aspect of this case further supports denying class certification. The size of the proposed class is unknown and likely unknowable. There appears to be no remotely reasonable mechanism for determining either the number, or the identity, of class members. Unlike retail establishments which routinely provide receipts to all customers, the undisputed fact here is that the system utilized by Midwest for in-flight sales did not automatically print receipts; it merely provided the option after each transaction. *See* Ex. 3B, Defendant's Response to Plaintiff's First Interrogatories to Defendant Midwest Airlines, Inc. ("Midwest Resp. to Pl.'s Int."), No. 6; Ex. 4, Decl. of Robert Schuerman, ¶ 5; Ex. 4B, ABANCO Training Materials. Flight attendants were trained and instructed to provide receipts only upon request. Ex. 3B, Midwest Resp. to Pl.'s Int., No. 6; Ex. 4, Decl. of Robert Schuerman, ¶ 5; Ex. 4B, ABANCO Training Materials. To Midwest's knowledge, no records or data indicate how many receipts were printed or which purchasers received them. Ex. 3B, Midwest Resp. to Pl.'s Int., No. 6; Ex. 4, Decl. of Robert Schuerman, ¶ 6. All that the evidence shows about the potential class size and membership is that it is dramatically smaller than the number of transactions that occurred during the relevant period of time.

In addition, many on-board purchases were made by business travelers who likely used employers' credit cards to make their purchases. However, the relief plaintiff seeks is available only to a "consumer," 15 U.S.C. § 1681n, which the FCRA defines as "an individual." 15 U.S.C.

§ 1681a(c).  Therefore, class size and membership is limited not only to the unknown subset of purchases where receipts were obtained, but also to a smaller and equally unknown subset of purchases where a personal credit card (as opposed, e.g., to an employer's or business credit card) was used and a receipt given.[4]

The inability to establish class size means that the plaintiff cannot prove aggregate class damages.  Simple mathematics cannot be used, *i.e.*, number of purchasers multiplied by statutory damages of $100.00 to $1,000.00, because many, if not most, of the purchasers would not be members of the class.   At best, this unique case would require fact-intensive individual determinations as to the number and identity of individuals who might have claims and who could be entitled to an award of statutory damages.  Plaintiff has not and cannot suggest any other means for proving aggregate class damages to a jury with even rough accuracy.

For all of these reasons, and others presented below, the motion should be denied.

## **BACKGROUND**

Plaintiff filed this putative class action on April 27, 2007.  The Complaint is bare bones in alleging that Midwest printed and provided to consumers point of sale credit card receipts that contained either more than the last five numbers of the credit card used and/or the card's expiration date.  *See* Pl.'s Compl. for Damages and Injunctive Relief ("Compl.") [Doc 1], ¶ 3. The Complaint alleges that providing receipts containing this information violates 15 U.S.C. § 1681c(g).

---

[4] Likewise, at various times during the purported class period, the hand held devices which printed receipts malfunctioned and were unable to print receipts.  *See* Ex. 4, Decl. of Robert Schuerman, ¶ 7.

CWDOCS 576431v1

By stipulation, plaintiff's allegations were limited to a putative class of persons who obtained receipts in connection with on-board, in-flight transactions. This is the class plaintiff seeks to have certified. *See* Pl.'s Mot. for Class Certification and Appointment of Class Counsel ("Pl.'s Motion") [Doc. 26]. It is undisputed that the receipts at issue did <u>not</u> include a prohibited number of credit card numbers' digits and that the inclusion of expiration dates is the only potential basis for plaintiff's claim. *See* Ex. 3B, Midwest Resp. to Pl.'s Int., No. 5. Further, it is undisputed that any receipts potentially at issue were provided between December of 2006 (when Midwest began implementation of the on-board credit card point-of-sale system) and June 10, 2007 when, shortly after being served with the Complaint, Midwest completed the process of ensuring that expiration dates were excluded from receipts. *See* Ex. 3B, Midwest Resp. to Pl.'s Int., Nos. 4 and 8.

1.    **Midwest Contracts To Deploy An On-Board Sales System That Prints Receipts Only On Request.**

Before December 2006, Midwest accepted only cash for on-board purchases. On or about September 1, 2006, Midwest contracted with a third party, ABANCO International LLC ("ABANCO"), to implement a system that accepted credit cards for in-flight purchases through the use of hand-held devices by flight attendants. *See* Ex. 5, ABANCO Contract. On December 30, 2006, Midwest began using the ABANCO hand-held devices to accept credit cards for in-flight purchases. *See* Ex. 3B, Midwest Resp. to Pl.'s Int., No. 4. During the applicable period, all transactions at issue were conducted using the hand-held devices and a proprietary software system developed by ABANCO. ABANCO licensed the software to Midwest and provides ongoing service and maintenance of the system. *See generally* Ex. 5, ABANCO Contract.

Midwest directed that the system be designed so that hand-held devices would not automatically print a receipt after each transaction. Ex. 1, Decl. of Alex Yarmulnik, ¶ 5. The reason for this was Midwest's conclusion that only business travelers would want a receipt. Ex. 4, Decl. of Robert Schuerman, ¶ 6. ABANCO determined and controlled what was to be printed on the receipts. Ex. 1, Decl. of Alex Yarmulnik, ¶¶ 2-5. Flight crews (who conducted the transactions at issue) were trained not to print and provide receipts unless a purchaser asked for one. *See* Ex. 3B, Midwest Resp. to Pl.'s Int., No. 6; Ex. 4, Decl. of Robert Schuerman, ¶ 5; Ex. 4B, ABANCO Training Materials.

**2.      The Plaintiff Obtained A Receipt.**

Plaintiff obtained a receipt from Midwest in connection with her purchase of lunch on a flight from Kansas to New York on April 18, 2007, using her personal VISA card. Ex. 7, Dep. of Lety Ramirez, at 34:6-13, 31:4-8. The receipt obliterated all but the last four digits of her VISA card number but contained the card's expiration date. *Id.* at 35:10-20. She acknowledged that she typically asks for sales receipts. *Id.* at 31:13-16. While plaintiff "shred[s] everything" containing her personal or financial information, *id.* at 25:4-10, 39:1-6, she preserved the receipt at issue in this case. Though she does not recall, she either mailed it or scanned and emailed it to Attorney Hafif, *id.* at 37:4-15, lead counsel in this and three other FACTA cases in which plaintiff serves as named plaintiff.[5] *Id.* at 17:8 through 18:3. She does not know where the original receipt is. *Id.* at 38:14-18.

---

[5] Horn, Aylward & Bandy, LLC, plaintiff's local counsel in this case, concurrently represents plaintiff in this and one other FACTA class action pending in this district. Ex. 7, Dep. of Lety Ramirez, 112:24 through 13:5.

Prior to filing suit, plaintiff made no effort whatsoever, directly or through another, to advise Midwest that the company was, in her view, inappropriately including expiration dates on receipts. *Id.* at 53:13-25. She made no effort to warn others of what she claims to be a threat of identity theft or fraud caused by Midwest's on-board receipts. *Id.* at 54:1-4.

**3.     Midwest's Response to the Complaint.**

Midwest was served with plaintiff's Complaint on or about May 10, 2007. *See* Ex. 1, Decl. of Alex Yarmulnik, ¶ 7. Midwest promptly reviewed the Complaint and the law on which it purported to rest. Because the Complaint alleged that plaintiff's claim arose in Kansas, Compl. [Doc. 1], at ¶¶ 7 and 8, and neither contained a description nor copy of the receipt, Midwest initially commenced a detailed review of the receipts provided in connection with the variety of ways in which plane tickets are sold, the only type of transaction easily understood as occurring "in" Kansas. Ultimately, Midwest's efforts led to a review of ABANCO's system, where a problem with receipts was discovered. Because Midwest did not have the ability to alter the ABANCO proprietary software's receipt printing function, Midwest contacted ABANCO on May 25, 2007. *See* Ex. 1, Decl. of Alex Yarmulnik, ¶ 8. An action plan was immediately established to prevent the continued printing of expiration dates on the receipts. Midwest provided constant follow-up until the ABANCO system was modified. *Id.*

On June 6, 2007, the updated software was installed on Midwest's ABANCO servers. Ex. 3B, Midwest's Resp. to Pl.'s Int., No. 8. This software excluded expiration dates from receipts printed by the hand-held devices. This process required each hand held device to be brought to Midwest facilities in either Milwaukee, Wisconsin or Kansas City, Missouri. By June 10, the last hand-held device was updated and after that date no receipt could have included an expiration date. *Id.*

7

4.    **There Is No Evidence or Claim That Midwest's Alleged Conduct Caused Plaintiff or Anyone Else Actual Harm.**

Plaintiff acknowledges that she has suffered no damages, and is not aware of "anyone[,] anywhere" who has suffered damages as a result of Midwest's receipts or receipts that contained expiration dates.  Ex. 7, Dep. of Lety Ramirez, at 41:5-7, 47:7-21, 103:19 through 104:9. Midwest has never received any complaint regarding the contents of receipts provided in connection with on-board sales.  It has never been fined by any of the credit card associations or any regulatory agency with respect to this issue.  *See* Ex. 1, Decl. of Alex Yarmulnik, ¶¶ 12-13. And, as far as Midwest knows, no customer of any business anywhere has ever suffered identity theft or credit card fraud caused or facilitated by the inclusion of an expiration date on a receipt. *Id.* at ¶ 14.

## ARGUMENT

Plaintiff must demonstrate "under a strict burden of proof" that the requirements for a class action under Fed. R. Civ. P. 23 are "clearly met."  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).  The first four prerequisites for certification as a class action are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If she meets her burden, plaintiff must then show, pursuant to Fed. R. Civ. P. 23(b)(3), that:

> the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

With respect to Rule 23(a), numerosity can be set to one side because, while the number of class members is unknown and probably unknowable, it is likely that it would meet the requirement.  While commonality and typicality raise serious concerns, those concerns merge with the discussion of manageability, superiority, and fairness in the context of Rule 23(b)(3).

I.  **THE TENTH CIRCUIT HOLDS THAT IT IS APPROPRIATE TO DENY CLASS CERTIFICATION WHERE IT WOULD CREATE THE POSSIBILITY OF ENORMOUS STATUTORY DAMAGES THAT ARE UNRELATED TO THE ALLEGED HARM CAUSED.**

Plaintiff seeks up to approximately $200 million in statutory damages.  At the same time, she acknowledges that she has suffered no actual harm and is unaware of any potential class member who has.  Apart from this lawsuit, Midwest has never received so much as a complaint about the receipts at issue, much less been made aware of any harm caused.  Standing alone, the enormity of potential damages, coupled with the fact of no apparent harm renders the proposed class action an inferior means of adjudication. [6]

The relationship of potential aggregate statutory damages to actual harm has played a role in the application of Fed. R. Civ. P. 23(b)(3) at least since Judge Frankel, one of the rule's architects, decided *Ratner v. Chemical Park N.Y. Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972).  In denying class certification in a statutory damages case where there was no proof of harm, the court observed:

---

[6] Early in the litigation, Midwest filed two Motions for Judgment on the Pleadings or, Alternatively Summary Judgment.  Midwest's First Motion sought dismissal on the basis that the receipt at issue was incapable of causing any injury and that this fact made statutory damages unavailable, precluded Article III jurisdiction, and violated Midwest's due process rights.  Midwest's Second Motion argued that the statute was unconstitutionally vague on its face and that, in any event, the impossibility of any actual injury precluded a willfulness finding as a matter of law.  Fully cognizant that the Court denied those motions, Midwest' respectfully includes those arguments as additional reasons to deny certification as a means of preserving the issues for possible permissive appeal from the certification decision.

> [D]efendant points out that (1) the incentive of class-action benefits is unnecessary in view of the Act's provisions for a $100 minimum recovery and payment of costs and a reasonable fee for counsel; and (2) the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant . . . .

*Id.* at 416.  On this ground, the court held that the proposed class did not satisfy the superiority requirement of Rule 23:

> It is not fairly possible in the circumstances to find the (b)(3) form of class action 'superior to' this specifically 'available [method] for the fair and efficient adjudication of the controversy.'"

*Id.*  Other courts have recognized that certification may be denied where no one was harmed and the statutory damages are enormous.  *See, e.g., London v. Wal-Mart Stores*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (noting that economic harm can be required for superiority especially "when, as in the present suit, the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff"); *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 234 (9th Cir. 1974); *Anderson v. Capital One Bank*, 224 F.R.D. 444, 452-53 (W.D. Wis. 2004) (rejecting class certification where potential damages sought were "wholly out of proportion to the harm done"); *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 350-351 (N.D. Ill. 2002)(class certification was not appropriate where statutory damages were "grossly disproportionate" to actual damages suffered by potential class members), *appeal dismissed*, 346 F.3d 734 (7th Cir. 2003); *Wilson v. Am. Cablevision*, 133 F.R.D. 573, 579 (W.D. Mo. 1990) (refusing to certify class that sought substantial statutory damages under Cable Communications Act, where no allegations of actual damages was made); *Mathews v. Book-of-the-Month Club, Inc.*, 62 F.R.D. 479, 479-80 (N.D. Cal. 1974) (denying certification where minimum statutory penalty was $50 million); *Rodriguez v. Family Publ'ns Serv., Inc.*, 57 F.R.D. 189, 194-96 (C.D.

Cal. 1972) (denying class certification where defendant faced over $25 million in potential civil penalties).

Denying class certification on the grounds of excessive statutory damages was approved by the Tenth Circuit in *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir. 1973). The *Wilcox* court upheld a decision of Judge Earl O'Connor denying certification specifically based on a finding that a class action was not superior given the lack of relation between harm and enormous statutory damages. *Id.* at 346. The Tenth Circuit examined in detail the analysis set out in *Ratner*, *supra,* and held that a defendant's exposure to enormous statutory damages unrelated to actual damages was a proper consideration in deciding whether to certify. *Id.* at 348. *See also Wilson v. American Cablevision*, 133 F.R.D. 573 577 (W.D. Mo. 1990) (denying certification in Cable Communications Act case where no actual damages were alleged and substantial class damages were sought; collecting and discussing cases including *Wilcox*); *Circle v. Jim Walter Homes, Inc.*, 535 F.2d 583, 589 (10th Cir. 1976) (discussing *Wilcox* and recognizing that it addresses a certification problem unique to cases where statutory damages rather than actual damages are sought).[7]

One of the most comprehensively reasoned FACTA certification decisions denied relief squarely on *Wilcox* and like authorities:

> Other courts have likewise denied class certification due to disproportionate damages. In *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1256, 1255 n. 5 (11th Cir. 2003), the court held that class

---

[7] The plaintiff asserts that no judge in this "District" has followed *Ratner*. She entirely ignores *Wilcox*, an appellate decision originating in this district, instead directing the Court to the Seventh Circuit's decision in *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948 (7th Cir. 2006) as providing the correct legal analysis. Pl.'s Mem. in Supp. of Class Certification [Doc. 27], pgs. 14-16. The plaintiff then goes on to say: "[T]hus, there is no binding precedent that mandates denial of class certification in this case." *Id.* at 15.

CWDOCS 576431v1

> treatment fails to meet the "superiority requirement" where the defendant's liability "would be enormous and completely out of proportion to any harm suffered by the plaintiff. In *Ratner*, 54 F.R.D. at 416, the court held that class certification lacks superiority where a violation is technical, and aggregation of statutory damages under TILA would be financially devastating for the defendant. Similarly, in *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 341-347 (10th Cir.1973), the court affirmed the district court's denial of class certification for TILA violations cases where class members were not harmed and aggregate of statutory damages would be extremely large.

*Soualian v. International Coffee and Tea LLC*, 2007 WL 4877902 at *2 n.6 (C.D. Cal. June 11, 2007).

*Ratner* and *Wilcox* are particularly applicable here. A substantial judgment against Midwest would be "devastating." Ex. 8, Decl. of Dennis O'Reilly, ¶ 3. If a class as envisioned by the plaintiff is certified, this becomes a bet the company case. There is no claim or evidence of any actual harm or damages to plaintiff or anyone else. Equally significant, Midwest did not obtain any financial benefit as a result of the conduct alleged. The case is not comparable to an antitrust case. Public policy does not require disgorgement of ill-gotten gains because there are none. Applying *Ratner*, *Wilcox* and its progeny, certification should be denied.

## II.   A CLASS ACTION IS NOT SUPERIOR BECAUSE OF THE ECONOMIC INCENTIVES PROVIDED BY CONGRESS FOR INDIVIDUAL ACTIONS.

A common thread throughout these cases, including *Wilcox*, is that in addition to class action status unfairly exposing a defendant to massive statutory damages unrelated to any actual injury, Congress provided significant economic incentives for individuals to pursue claims, *e.g.*, attorneys' fees and possible punitive damages. *See Wilson*, 133 F.R.D. at 579 ("The putative class members have a clear means to address any statutory violation by way of individual lawsuits"); *Circle*, 535 F.2d at 589 (recognizing that individual lawsuits "suffice" in the "*Wilcox-*

12

type of case"); *cf. Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*,  445 U.S. 326, 338-339, 100 S.Ct. 1166, 1174 (U.S.Miss.,1980) (Rule 23 is designed for "aggrieved persons [who] may be without any effective redress unless they may employ the class-action device").

Section 1681n provides actual attorneys' fees and punitive damages to any person who prevails in a claim of a willful violation.  And, if there are actual damages, § 1681o provides for recovery, including attorneys' fees, upon a showing of mere negligence instead of willfulness. Here Congress provided to individuals an incentive and reasonable means to sue without resorting to a class action.   Many courts have recognized this and similar Congressional scheme(s) as significant when denying class certification.  *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 456 (E.D. Pa. 2000) ("The ability to recover attorneys' fees or punitive damages belies the projected problems of a negative value suit, and offsets the potential costs associated with individual litigations for relatively small financial amounts");[8] *Wilson v. Am. Cablevision*, 133 F.R.D. 573, 579 (W.D. Mo. 1990) (denying certification because $100-$1,000 statutory damages range provided every individual "with an appropriate remedy by way of individual actions"); *Alsup v. Montgomery Ward*, 57 F.R.D. 89, 93 (N.D. Ca. 1972) (statutory damages scheme was "specifically designed by Congress to encourage each consumer . . . to enforce the Act through individual effort," and that "the incentive of class action benefits is hardly necessary," and class action not desirable as a deterrent in light of the "horrendous, possibly

---

[8] Individual suits would also avoid a peculiar danger class treatment could pose to class members in this case.  Assuming that the disclosure of an expiration can facilitate "identity theft" or fraud (and plaintiff insists it can), members of the proposed class may become victims of theft or fraud as a result of the alleged conduct, after the time to opt-out of this case has come and gone.  A class action judgment could preclude class members who suffer actual damages from seeking redress.  If actual damages are possible, certification may prejudice any class member who suffers actual damages in the future.  *See Klingensmith v. Max & Erma's Restaraunt's, Inc.,* 2007 WL 3118505 at *1 (W.D. Pa. Oct. 23, 2007) (in approving class settlement, exclusion of class members who suffer damages deemed critical).

13

annihilating punishment"); *Mathews v. Book of the Month Club, Inc.*, 62 F.R.D. 479 (N.D. Ca. 1970) (holding that statutory penalties including attorneys' fees serve as a substitute for class action procedures in that they vindicate the rights of the small litigant).

Another court dealing with a different substantive portion of FCRA but the same remedies statutes at issue here denied certification in reliance on *Wilcox*:

> A district court must be able to avoid creation of a large and unwieldy class, where such a class is not necessary to protect the plaintiffs' rights.  *See Wilcox v. Commerce Bank*, 474 F.2d 336 (10th Cir. 1973).  Here, creation of a class is not necessary because individual consumers can bring and have brought separate actions under the FCRA, and successful consumers can recover counsel fees.  In fact, the Act itself seems to contemplate enforcement by the Federal Trade Commission and through individual negligence actions.

*Pendleton v. Trans Union Sys. Corp.*, 76 F.R.D. 192, 198 (E.D. Pa. 1977).

Apart from the superiority of individual lawsuits over a class action, the Federal Trade Commission ("FTC") has authority to enforce FACTA under Section 1681s.  *See e.g., Legge v. Nextel Communications, Inc.*, 2004 WL 5235587 at *16 (C.D. Ca. June 25, 2004) ("In light of this balanced statutory scheme enacted by Congress, the court concludes that regulation by the FTC, coupled with individual actions for damages (and attorneys fees) is superior to a class action for statutory damages by tens of millions of consumers who claim no actual economic loss.").

Midwest has been in total compliance for almost a year.  Class treatment is not a superior method to protect consumers, especially where Congress has encouraged individual action by providing each individual with significant financial incentives and an entirely workable avenue by which to pursue their own remedies.

III.    CONGRESS, IN EMPOWERING THE FEDERAL TRADE COMMISSION TO
        ENFORCE VIOLATIONS OF FACTA, DIRECTED COURTS TO CONSIDER
        THE "EFFECT ON ABILITY TO CONTINUE TO DO BUSINESS" AND THE
        "ABILITY TO PAY" IN IMPOSING A PENALTY

Section 1681s of Title 15 authorizes the FTC to administratively enforce FACTA.  The

law contains a civil penalty of not more than $2,500 per violation for "a knowing violation,

which constitutes a pattern or practice of violations of this subchapter . . . ."   15 U.S.C.

§ 1681s(a)(2)(A).   However, Congress, in recognizing the potential for debilitating penalties,

restricted a higher penalty for far more egregious conduct than the conduct alleged here.   15

U.S.C. § 1681s(a)(2)(B) provides:

> In determining the amount of a civil penalty under subparagraph
> (A), the court shall take into account the degree of culpability, any
> history of prior such conduct, ability to pay, effect on ability to
> continue to do business, and such other matters as justice may
> require.[9]

The statutory scheme created by Congress provides significant financial incentives for

individuals to pursue claims.  In addition, the FTC has substantial enforcement powers.  Along

with enacting this comprehensive enforcement scheme, Congress expressed its will that

enforcement of FCRA and FACTA should not unnecessarily damage a business.   A court

imposing a civil penalty in an FTC action must consider "ability to pay" and the "effect on ability

to continue to do business."   It would be at odds with this cohesive regulatory scheme to allow

class actions to proceed which threaten to financially disable a company while at the same time,

for all practical purposes, prohibiting the FTC from doing the same thing.  Consideration of these

---

[9] At least one court has recognized that the existence of an action by the FTC, coupled with the right for
individual actions, is superior to a class action "of consumers who claim no actual economic loss."
*Legge*, 2004 WL 5235587 at *16.

financial issues when deciding whether to certify a class is consistent with the broad policies enumerated by Congress.

## IV.  A GROWING COLLECTION OF COURTS HAVE FOUND THAT PROPOSED FACTA CLASS ACTIONS IN THE SAME POSTURE AS THE ONE AT BAR ARE NOT THE SUPERIOR MEANS OF ADJUDICATION.

Many cases combining all the points outlined above have denied class certification:

> because (1) the plaintiff sought damages grossly disproportionate to any harm suffered, (2) the defendant subsequently complied with FACTA, (3) certification would create potential for attorney abuse, and (4) individual class members could bring their own actions. *See Najarian v. Avis Rent a Car Sys.,* No. CV 07-0588, 2007 U.S. Dist. LEXIS 59932 (CD. Cal. June 13, 2007); *Najarian v. Charlotte Russe, Inc.*, No. CV 07-0501, 2007 U.S. Dist. LEXIS 59879 (C. D. Cal. June 21, 2007); *Soualian v. Int'l Coffee & Tea LLC*, No. CV 07-0502, 2007 U.S. Dist. LEXIS 44208 (CD. Cal. June 11, 2007); *Spikings v. Cost Plus Inc.*, No. CV 06-8125, 2007 U.S. Dist. LEXIS 44214 (C.D. Cal. May 25, 2007); *Legge v. Nextel Commc'ns, Inc.*, No. CV 02-8676, 2004 U.S. Dist. LEXIS 30333 (C. D. Cal. June 24, 2004); *see also Lopez v. Gymboree Corp.*, No. CV 07-0087, 2007 U.S. Dist. LEXIS 44461, at *13 (N.D. Cal. June 7, 2007) (noting that the due process issues implicated by excessive class damages "should be raised in connection with any class certification proceedings").

*Saunders v. Louise's Trattoria*, 2007 WL 4812287 at *1 (C.D. Cal. Oct. 23, 2007); *see also Azoiani, supra,* (same); *Vasquez-Torres v. McGrath's Publick Fish House, Inc.*, 2007 WL 4812289 at *6 (C.D. Cal. Oct. 12, 2007) (same); *Price v. Lucky Strike Entm't, Inc.,* 2007 WL 4812281 at *4 (C.D. Cal. Aug. 31, 2007) (same).

The undisputed facts of this case present an even more compelling reason to deny certification. Here, plaintiff's failure to ascertain the size of the class would expose Midwest not only to damages unrelated to harm but to enormous damages based on a class size that necessarily will be randomly determined or, at a minimum, the product of sheer guesswork.

16

## V.   DETERMINING DAMAGES AND PROCESSING CLAIMS REQUIRES A FACT INTENSIVE, CASE-BY-CASE ADJUDICATION BECAUSE THE SIZE AND MEMBERS OF THE PURPORTED CLASS CANNOT BE ASCERTAINED.

In the six or so months of the asserted class period, Midwest engaged in approximately 211,000 on-board sales transactions.  Ex. 2, Decl. of Dawn Polzean, at ¶ 4.  Because (i) the ABANCO system did not automatically print receipts for each transaction; (ii) flight crews were trained to print receipts only upon customer request; and (iii) at various times, glitches prevented the printing of any receipts – the actual class size is significantly smaller than the number of transaction.  No records have ever been created that indicate how many receipts were provided customers or who those customers were.  Additionally, as a matter of law, only "consumers," *i.e.*, "individuals," *see* 15 U.S.C. § 1681n, § 1681a(c), can share plaintiff's claim.  *See* 16 C.F.R. Part 600, App. § 603 (2007) (FTC's FCRA regulations) and *Antwerp Diamond Exch. Ov Ar. v. Better Bus. Bureau*, 637 P.2d 733, 738 (Ariz. 1981).

Therefore, the determination of class size and membership would not only require ascertaining transactions in which receipts were provided but would also require determining whether a purchaser's personal card, as opposed to a business' card, was used.  Again, Midwest does not possess any records that permit this determination and is unaware that any exist.  Thus, the size of the proposed class and its membership is unknown and probably unknowable.

Even though the plaintiff has known about these problems for a long time, Ex. 3, Decl. of Robert H. Friebert, ¶¶ 2-3, plaintiff has neither acknowledged them,[10] nor proposed any model to

---

[10] Plaintiff glosses over these issues, declaring that "the operative questions in this litigation are extremely limited."  Pl.'s Mem. in Supp. of Class Certification [Doc. 27], pg. 13.  Completely ignoring the undisputed fact that receipts were not printed for a substantial and significant number of transactions and that many transactions involved business credit cards, plaintiff casually and wrongly asserts "that the class size is more than 200,000."  *Id.* at 8.

resolve them, assuming they can be resolved.   Given the multitude of variables, it seems inconceivable that a qualified expert could provide a sustainable opinion on aggregate class damages without engaging in a fact intensive, case-by-case analysis.   However, the time for the plaintiff to identify experts has come and gone.   *See* Scheduling Order [Doc. 13], pg. 5.   No experts were named.   Thus, the plaintiff has not demonstrated that aggregate class statutory damages can be determined without resorting to individual, case-by-case proceedings.   Simple mathematics will not work (number of purchases times $100 to $1,000) because the number of receipts actually printed for individuals is not known or knowable.   Plaintiff offers no way to determine whether statutory damages for the class should be $200 million, $20 million, zero, or somewhere in between.

This problem is of a greater magnitude than those that have led other FACTA courts to deny certification.   Several have found that the difficulty in distinguishing corporate receipts from individual receipts a substantial factor in denying class certification.   In *Najarian v. Avis*, 2007 WL 4682071 (C.D. Cal., June 11, 2007), the court observed:

> [C]loser examination indicates that even if the willfulness question is central to this case, it does not give rise to liability independent of individualized factual determinations as to which customers were "consumers" and which obtained "receipts" containing Prohibited Information.   Because such individualized questions underlie any determination of Defendants' liability, and liability is the main issue in this case, the main issue requires separate adjudication of each class member's claim and certification is inappropriate under the fourth element of the 23(b)(3) superiority analysis.

*Id*. at *4 (denying certification, "[C]ertification would necessarily entail individualized factual determinations for up to 1.66 million customers who might be members of the proposed class . . ."); *see also, Azoiani v. Love's Travel Stops and Country Stores, Inc.*, 2007 WL 4811627

(S.D. Cal., Dec. 18, 2007); *Arabian v. Sony Elecs., Inc.,* 2007 WL 627977 at *12 (S.D. Cal. Feb. 22, 2007); *Lewis v. Riddle*, 1998 U.S. Dist. LEXIS 20465 at *17 (W.D. La. 1988); *Zeltzer v. Carte Blanche Corp.*, 76 F.R.D. 199, 203 (W.D. Pa. 1977); *Berkman v. Sinclair Oil Corp.*, 59 F.R.D. 602, 609 (N.D. Ill. 1973). Here, the issue is significantly compounded by the unique fact that receipts were not even printed for many, if not most, of the transactions involved.

These same problems would also complicate the administration of a claims process. Determining class membership would necessarily depend on individual, case-by-case, assessments of credibility given the small number of actual receipts that are likely to exist a year or more after they were printed. Thus, the class is unmanageable. *See Najarian* and *Azoiani*, *supra*.

It is not enough for plaintiff to set out a coherent class definition. To meet Rule 23's requirements, plaintiff must propose a class that makes it "administratively feasible to determine whether a particular individual is a member." *Dumas v. Albers Med., Inc*., 2005 WL 2172030 at *5 (W.D. Mo. Sept. 7, 2005) (*quoting Wright, Miller & Kane*, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1760 (3d ed. 2005)). A plaintiff must "demonstrate that the aggrieved class can be readily identified without resort to intensive, individualized factual inquiries." *Id.* (*citing Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981)). For a class to be "administratively feasible" membership must be determinable by "objective" rather than "subjective" criteria. *McBean v. New York*, 228 F.R.D. 487, 492 (S.D. N.Y. 2005).

Earlier this month, the Court of Appeals for the Second Circuit rejected class certification, in part, when presented with a similar issue. In *McLaughlin v. American Tobacco Co.*, ___ F.2d ___, 2008 WL 878627 (2d Cir. Apr. 3, 2008), the court reversed the certification

of a class because the class would violate the Rules Enabling Act and due process of law, characterizing the distribution method as an impermissible "fluid recovery." The court noted:

> Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability. See, e.g., In re Hotel Tel. Charges, 500 F.2d 86, 90 (9th Cir. 1974) (rejecting a fluid recovery argument because "allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights," in violation of the Rules Enabling Act); Eisen, 479 F.2d at 1019 ("[P]ossible recoveries run into astronomical amount [and] generate more leverage and pressure on defendants to settle . . . .").

*Id.* at *11. The court went on to observe that "even if defendants were able to avoid overcompensating *individual* plaintiffs, they would still be overpaying in the aggregate." *Id.* (*emphasis in original*). And "when fluid recovery is used to permit the mass aggregation of claims, the right of defendants to challenge the allegations of individual plaintiffs is lost, resulting in a due process violation." *Id.* at *11.

In contrast to the plaintiff here, in *McLaughlin*, the plaintiffs attempted to meet these very issues with extensive studies and expert reports. The Court of Appeals held that those studies and reports were insufficient to overcome these issues. *Id.* at *11. Here, the plaintiff has provided no evidence, no experts and no model. She makes no attempt whatsoever to address this fundamental obstacle to class treatment. The fact that readily available individual claims avoid the morass plaintiff presents confirms that plaintiff's motion should be denied.

## CONCLUSION

For all the reasons stated herein, Midwest Airlines respectfully requests that the Court deny plaintiff's motion.

Respectfully submitted:

LATHROP & GAGE L.C.

By: /s/ Carrie E. Josserand
Brian C. Fries, KS #15889
2345 Grand Blvd., Suite 2800
Kansas City, MO  64108-2684
(816) 292-2000  Fax: (816) 292-2001
bfries@lathropgage.com

Carrie E. Josserand, KS #18893
10851 Mastin Blvd., Suite 1000
Overland Park, KS  66210-1669
(913) 451-5135  Fax: (913) 451-0875
cjosserand@lathropgage.com

Robert H. Friebert
Jeremy P. Levinson
Friebert, Finerty & St. John, S.C.
330 East Kilbourn Avenue, Suite 1250
Milwaukee, WI  53202
(414) 271-0130  Fax: (414) 272-8191
rhf@ffsj.com
jpl@ffsj.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 15th day of April, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following counsel of record:

Joseph A. Kronawitter          Greg K. Hafif
Robert A. Horn                 Law Office of Herbert Hafif, APC
Horn Aylward & Bandy, LLC      269 West Bonita Avenue
2600 Grand Blvd., Suite 1100   Claremont, CA 91711
Kansas City, MO 64108

/s/ Carrie E. Josserand
Carrie E. Josserand

21

CWDOCS 576431v1